UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

    Case No. 1:20-cr-56-1
    JUDGE DOUGLAS R. COLE

KENNETH SMITH,

    Defendant.

## OPINION AND ORDER

This cause comes before the Court on Defendant Kenneth Smith's Motion to Suppress (Doc. 38). In that motion, Smith argues that the government obtained his confession in violation of his Fifth Amendment *Miranda* rights. For the reasons discussed below, the Court **DENIES** the motion.

## FACTUAL BACKGROUND

**A.**    **Police Arrest Smith For Distributing Cocaine.**

This criminal case centers on allegations that Smith and one other defendant (David Long), conspired to possess with intent to distribute controlled substances in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 846. According to the Complaint, Smith and Long both had roles in a distribution operation involving multi-kilogram quantities of controlled substances. (Compl., Doc. 1, #49).

The instant motion relates to events that occurred in connection with Smith's arrest and interrogation on March 18, 2020. That day, agents were conducting surveillance of Smith, a "known drug trafficker," when they observed him having a conversation with co-defendant Long. (*Id.* at ¶¶ 3–4, #50–51). As Long walked away,

agents noticed a suspicious bulge under Long's sweatshirt that was not there when he first met with Smith. (*Id.* at ¶ 4, #51). Agents then followed Long's car and pulled him over when they observed a traffic violation. (*Id.* at ¶ 5, #51). Right before Long stepped out of the vehicle, officers watched him contact Smith using FaceTime to tell Smith about the traffic stop. (*Id.*). As Long was exiting the car, two packages, later identified as each containing about 1 kg of cocaine, fell from his sweatshirt. (*Id.* at ¶ 6, #51).

Having discovered unlawful controlled substances in Long's possession, agents then also located Smith's vehicle, which was parked outside a residence belonging to the grandmother of Smith's girlfriend. (*Id.* at ¶¶ 7–8, 11, #51–52). After locating Smith within the residence, the agents brought a canine to conduct a "free-sniff" of the vehicle. When the canine alerted, the officers obtained a search warrant for the vehicle and residence. They located roughly 27 kg of cocaine in the car. (*Id.* at ¶ 9, #52). Officers then transported Smith and his girlfriend separately to the Hamilton County Sheriff's Patrol Headquarters.

**B.  Police Interrogate Smith And He Refuses To Sign The *Miranda* Waiver Form.**

Smith then met with Paul Fangman, who is an investigator with the Hamilton County Sheriff's Office, in an interview room at the station. After a brief, cordial conversation, Smith placed his head in his hands and said that his "life [was] over." (Mot. to Suppress Hr'g Tr. ("Tr."), Doc. 50, #221–22). At that point, Fangman obtained something labeled an "Advice of Rights Form," which is a one-page form that lists a defendant's rights under *Miranda*. (Reg'l Narcotics Unit Investigative Report

2

("RENU Report"), Doc. 38-1, #167–68; Tr. at #222; Advice of Rights Form ("*Miranda* Form"), Gov't Ex. 1). Fangman read Smith his *Miranda* rights directly from that form, and then showed Smith the form with his rights printed on it. (*Id*.). After Smith had an opportunity to review the form, Fangman asked him if he understood his rights, and Smith stated that he did. (RENU Report at #168; Tr. at #222). When Fangman asked Smith to sign the *Miranda* form, though, Smith politely declined to do so. (RENU Report at #168; Tr. at #224). As to why Smith refused to sign, Smith said he thought other inmates in federal prison might look up his case file and think that his signature meant that he was a "snitch." (Tr. at #226).

**C.   At The Beginning Of The Interview, Smith Selectively Answers Questions And Repeatedly Asks About His Girlfriend.**

After the discussion of *Miranda* rights was complete, Smith immediately asked about his girlfriend. He told investigators that she was pregnant and he protested that she should never have been brought to the station in the first instance because "she didn't have nothin' to do with this." (RENU Report at #168, Tr. at #226–27). Investigators did not respond to Smith's concerns and instead asked Smith about the cocaine he allegedly distributed to Long. (RENU Report at #168, Tr. at #228). Smith refused to answer, insisting that he did not want to be perceived as a snitch in prison. (RENU Report at #168, Tr. at #228). Again, Smith directed the conversation to his concern for his girlfriend, stating that anything that happened was "on him and no one else." (RENU Report at #168). In turn, investigators again attempted to ask about the cocaine sale to Long, and Smith again refused to give a substantive answer, allegedly because of his fear of being labeled a snitch. (*Id*.).

3

Investigators then turned their attention to the circumstances surrounding the drug transaction. Specifically, investigators asked why Smith was at his mother's house the morning of the transaction. Smith responded that he had been there to check on her affairs. (RENU Report at #168).

### D. Later In The Interview, Investigators Explain Why They Arrested Smith's Girlfriend And Smith Makes Incriminating Statements.

Once again, Smith began asking about his girlfriend and insisting that she did nothing wrong. (RENU Report at #168). In response, the police explained that they arrested her because she drove him to multiple drug transactions around Ohio and permitted him to store and sell drugs from her vehicle. (*Id.* at #168–69). At that point, Smith's demeanor changed. He appeared "thoughtful" and admonished himself for involving his girlfriend. (*Id.* at #169; Tr. at #231–32). Then, for the first time, Smith admitted that he obtained cocaine from a supplier earlier that day. (Tr. at #231–32).

Investigators were able to engage in a productive conversation with Smith after that. Smith claimed that, while he was not quite sure how much cocaine he received, he had distributed roughly five kilograms of cocaine the morning of his arrest. (Tr. at #232). The cocaine, Smith explained, was on consignment, and he planned to meet with the supplier later to give payment in increments. (Tr. at #233). Smith even discussed his profit margins on each kilogram of cocaine. (RENU Report at #170). That said, Smith still repeatedly refused to identify his supplier, citing his earlier concern that federal inmates would label him a "snitch." (*Id.* at #171). Eventually, investigators indicated that they intended to execute a search warrant at Smith's mother's house and grandmother's house, to which Smith "confidently

4

stated" that there was no cocaine at either address. (Tr. at #228–29). If the cocaine was not there, investigators suggested, then perhaps there might be cocaine in Smith's car or his girlfriend's car. (Tr. at #229). Smith did not speak in response to that suggestion. (*Id.*).

Investigators then informed Smith that they had released his girlfriend without charging her. (RENU Report at #171). Smith appeared agitated and complained that investigators did not let him talk to an attorney. (*Id.* at #172). Investigators construed that statement as Smith asserting his right to consult an attorney and, thus, ceased the interview at that time. (Tr. at #230).

## LAW AND ANALYSIS

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. To secure that right, courts require officers to give *Miranda* warnings before a custodial interrogation. These familiar warnings remind the suspect that "he has the right to remain silent, that anything he says can be used against him in a court of law," and that he has the right to consult an attorney. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Here, there is no dispute that investigators read Smith his *Miranda* rights off the "Advice of Rights form," and then showed Smith the form with his rights printed on it.

Even so, Smith argues that the Court should exclude his statements for three reasons. First, Smith contends that he never waived his *Miranda* rights. Second, Smith maintains that investigators coerced him into making incriminating

5

statements by "preying" on his concern for his pregnant girlfriend. Third, and finally, Smith argues that he affirmatively asserted his right to remain silent when he refused to sign the *Miranda* waiver form. The Court takes each argument in turn.

**A. Smith Implicitly Waived His *Miranda* Rights.**

A suspect can waive his *Miranda* rights in one of two ways: expressly or implicitly. *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010). The prosecutor bears the burden to establish either type of wavier by a preponderance of the evidence. *Colorado v. Connelly,* 479 U.S. 157, 168 (1986). Neither party disputes that Smith did not expressly waive his rights either verbally or in writing. Specifically, Smith did not sign the *Miranda* form at the start of the interview and never affirmatively declared that he intended to waive his *Miranda* rights. Those facts, however, are not "fatal" to the government's waiver argument, because there is still the possibility that Smith implicitly waived his *Miranda* rights. *United States v. Kaufman*, 92 F. App'x 253, 256 (6th Cir. 2004).

A wavier, whether explicit or implicit, requires the intentional relinquishment of a *known* right. Thus, to succeed on a waiver argument, the prosecution must first show that Smith "understood his *Miranda* rights and the consequences of waiving those rights." *Garner v. Mitchell*, 557 F.3d 257, 261 (6th Cir. 2009). The government has made that showing on the record here. At the start of the interrogation, investigators read Smith the Advice of Rights form which listed his *Miranda* rights. (*See Miranda* Form, Gov't Ex. 1). Investigators then "displayed the form on the table in front of Smith to allow him the opportunity to review the rights." (RENU Report

at #168). Smith, in turn, orally "indicated that he understood the rights as presented." (*Id.*). That suffices to demonstrate the "knowing" part of the waiver inquiry.

In addition, Smith's conduct during the interrogation demonstrates that he understood his rights. For example, Smith strategically tailored his responses, or non-responses, to the investigator's questions. Smith knew when he wanted to keep silent, i.e. when investigators asked him to identify his supplier, and when he wanted to speak, i.e. when investigators asked Smith why he went to his mother's house on the morning of his arrest. This conduct, too, indicates that Smith knew he had the right to remain silent. *See Garner*, 557 F.3d at 265 (explaining that courts are to consider "evidence of the defendant's conduct during, and leading up to, the interrogation" when deciding whether a waiver occurred). These circumstances, especially when coupled with the steps that the investigators took to advise Smith of his rights, more than meet the government's burden of showing that he understood his rights and the consequences of waiving them.

The next inquiry, then, is whether Smith in fact waived those rights. As noted above, here there is no evidence of an express waiver, either written or oral. But, as also noted, that is not the end of the matter, as a criminal defendant can implicitly waive his or her *Miranda* right. Implied waiver occurs when the defendant acts in a manner that is inconsistent with his known Fifth Amendment rights. *Berghuis*, 560 U.S. at 385 ("As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights

7

afford."). Where the right at issue, as here, is the right to remain silent, a defendant's decision to speak to the police is inconsistent with that right, and thus can constitute an implied waiver. *Id.* ("[The defendant] waived his right to remain silent. … [H]e chose not to invoke or rely on [that right] when he did speak.").

Here, despite understanding that he had a right to remain silent, Smith repeatedly spoke to the police in the interrogation room about a number of topics, from discussions about his mother to conversations about the logistics surrounding his cocaine distribution operation. That conduct is inconsistent with any assertion of *Miranda* rights, and thus functions as an implied waiver of Smith's Fifth Amendment right to remain silent. *See, e.g.*, *United States v. Lee*, 631 F. Supp. 2d 915, 927 (S.D. Ohio 2009) ("The fact that Lee indicated that he understood his rights yet proceeded to answer Officer Lanter's questions about the rifle operates as an implied wavier of his right to remain silent.").

As an important note, the calculus on the waiver issue does not change merely because Smith decided to answer some questions and ignore others—a defendant may selectively waive his or her *Miranda* rights. *Berghuis*, 560 U.S. at 386 (implied waiver existed even when the defendant gave "sporadic answers to questions throughout the interrogation").

## B. Smith's Waiver Was Voluntary.

Smith next contends that any waiver was not voluntary because the officers elicited incriminating information only by "preying on his concern for his pregnant girlfriend" and "manipulating [him] by using his concern over his pregnant

8

girlfriend's well-being against him." (Smith Mot. to Suppress, Doc. 38, #164). This argument misunderstands the definition of "coercion" within the meaning of the Fifth Amendment. The Constitution is not concerned with "moral and psychological pressures to confess emanating from sources other than official coercion." *Oregon v. Elstad*, 470 U.S. 298, 304–05 (1985). In other words, an officer who "guilts" a suspect into confession has not violated that suspect's Fifth Amendment rights.

Take, for example, the moral pressure at play in *Berghuis*. In that case, a murder suspect refused to say almost anything for hours until an officer asked him: "Do you believe in God?" *Berghuis*, 560 U.S. at 376. The suspect said "yes" and "well[ed] up with tears." *Id*. The officer then said: "Do you pray to God?" *Id*. The suspect again said "Yes." *Id*. Finally, the officer said: "Do you pray to God to forgive you for shooting that boy down?" *Id*. The suspect again answered "Yes." *Id*. The Court explained that while the questioner's reference to the suspect's religious beliefs might exert moral pressure, that is simply not the kind of threat that will render a confession involuntary. *Id*. at 377–78. Just as moral pressure does not count as a coercion, a suspect's internalized sense of guilt or moral obligation is not enough, either. *See Connelly,* 479 U.S. at 170–71 (confession was still voluntary even though the defendant thought the "voice of God" compelled him to confess).

Here, Smith alleges that investigators used this same kind of moral pressure to guilt him into confessing. Yet, the most investigators did, even on Smith's telling, was suggest that it was Smith's fault that his girlfriend was arrested and that she disapproved of his drug-dealing activities. While these suggestions might have made

9

Smith uncomfortable to the point that it motivated his confession, it simply does not rise to the level of coercion within the meaning of the Fifth Amendment.

Finally, the fact that investigators waited until the very end of the interview to inform Smith that they had released his girlfriend is not grounds to exclude his confession. Notably, "the Constitution [does not] require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." *Moran v. Burbine*, 475 U.S. 412, 422 (1986) (citations omitted). While withholding information may be "objectionable as a matter of ethics," "such conduct is only relevant to the constitutional validity of a waiver if it deprives a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Id.* at 423–24. Whether police were going to charge Smith's girlfriend is an issue completely unrelated to Smith's ability to understand his rights. Therefore, the police were under no legal obligation to tell Smith that they released his girlfriend from custody.

**C.    Smith's Refusal To Sign The *Miranda* Form Is Not The Same Thing As Asserting His Right To Remain Silent.**

In addition to the duty to inform an accused of his rights, "*Miranda* requires that the police respect the accused's decision to exercise the rights outlined in the warnings." *Moran,* 475 U.S. at 420 (quoting *Miranda,* 384 U.S. at 473–74). Thus, police officers must stop an interrogation if a suspect asserts his right to remain silent or his right to counsel. *Berghuis,* 560 U.S. at 381. But, "an accused who wants to invoke his or her right to remain silent [must] do so unambiguously." *Id.* In other

10

words, the investigators' duty to stop arises when a defendant *affirmatively* invokes the right to remain silent; mere silence is not enough.

In fact, in *Berghuis*, the Court held that a defendant did not invoke his right to remain silent even though he hardly spoke during first two hours and 45 minutes of a three-hour interrogation. *Id.* To invoke the right, the Court explained, the defendant would have to "say that he wanted to remain silent or that he did not want to talk with the police." *Id.* at 382. The defendant there "did neither, so he did not invoke his right to remain silent." *Id.*

The parties do not dispute that Smith never made these simple unambiguous statements. Smith, however, believes that is not the end of the story. In Smith's view, he did not have to affirmatively say "I want to remain silent" because he refused to sign the waiver, and that alone was an invocation of his right to remain silent. As support for that argument, Smith cites *United States v. Calvetti*, where the Sixth Circuit held that a defendant clearly and unambiguously invoked her right to remain silent when she checked a box on a Miranda waiver form indicating that she understood her rights but did not want to answer questions. 836 F.3d 654, 661–62 (6th Cir. 2016). Smith argues that because the form here, unlike the form in *Calvetti*, did not include an area for the defendant to mark "no," he did the functional equivalent saying "no" when he refused to sign the form.

What Smith's argument misunderstands is that "a refusal to *waive* rights, however unequivocal, is not necessarily equivalent to an unambiguous decision to *invoke* them." *United States v. Plugh*, 648 F.3d 118, 125 (2d Cir. 2011); *see also*

11

*Smith v. Illinois,* 469 U.S. 91, 98 (1984) ("Invocation and waiver are entirely distinct inquiries, and the two must not be blurred by merging them together."). The Supreme Court's holding in *Berghuis* demonstrates this principle. There, the Court explained that the decision to remain silent, even when coupled with the conduct of actually remaining silent, is not enough to invoke the right to remain silent in a manner giving rise to an obligation to stop an interrogation. *Berghuis*, 560 U.S. at 381. And, if a decision to not speak, coupled with the behavior of *not speaking*, fails to support a finding that a defendant invoked his right to remain silent, then failing to sign a waiver, coupled with the behavior of *speaking*, is certainly insufficient. In short, it appears that passive non-action—whether sitting silently, or declining to sign a form—is not enough, in and of itself, to count as an invocation of a suspect's *Miranda* rights. The Sixth Circuit's holding in *Calvetti* comports with this rule. There, the defendant affirmatively indicated, in writing, that she wanted to remain silent. Here, by contrast, Smith never affirmatively indicated in any fashion that he wanted to invoke his right to remain silent. All he did was refuse to sign a waiver form. That, without more, is not enough, given his later decision to engage with police officers.

## CONCLUSION

For the reasons above, the Court **DENIES** Smith's Motion to Suppress (Doc. 38).

**SO ORDERED.**

August 2, 2021
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**